1

2

3

4

5

6

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| 7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15 | COMMUNITY ASSOCIATION FOR THE RESTORATION OF THE ENVIRONMENT, a Washington nonprofit corporation, FRIENDS OF TOPPENISH CREEK, a Washington nonprofit corporation, and CENTER FOR FOOD SAFETY, a Washington, DC nonprofit corporation,<br><br>        Plaintiffs,<br><br>  v.<br><br>VIEW POINT DAIRY, a sole proprietorship,<br><br>        Defendant. | Case No. 1:22-CV-3143-TOR<br><br>CONSENT DECREE |

16 **WHEREAS,** Plaintiffs Community Association for Restoration of the

17 Environment, Inc. ("CARE"), Friends of Toppenish Creek, and Center for Food

18 Safety (together, the "Plaintiffs"), filed a Complaint contemporaneously with this

19 Consent Decree against View Point Dairy, (collectively "Defendant") (the

20 "Parties" collectively or a "Party" in the singular), alleging violations of the

CONSENT DECREE ~ 1

Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq. ("RCRA"), and seeking declaratory and injunctive relief, civil penalties and attorneys' fees and costs; and

**WHEREAS**, Plaintiffs' claims and this Consent Decree relate to the dairy operations and facilities that are the subject of the Complaint and 90-Day Notice of Intent ("90-Day Notice") filed in this action; and

**WHEREAS**, Defendant denies Plaintiffs' claims, allegations, and any liability for each and every alleged violation; and

**WHEREAS**, Plaintiffs and Defendant agree that settlement of these matters is in the best interest of the Parties and the public, and that entry of this Consent Decree without additional litigation is the most appropriate means of resolving this action; and

**WHEREAS**, Plaintiffs and Defendant, after consultation with their respective counsel and without trial or final adjudication of the issues of fact or law with respect to Plaintiffs' claims or allegations, agree to the entry of this Consent Decree to avoid the risks of litigation and to resolve all existing controversies between them;

**NOW, THEREFORE**, without trial of any issue of fact or law, and without admission by Defendant of any of the facts or violations alleged in the Complaint or the 90-Day Notice, and upon consent of the Parties, and upon consideration of

CONSENT DECREE     ~ 2

the mutual promises herein contained, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

### Section 1: General Provisions

1. This Court has jurisdiction over the Parties and subject matter of this action pursuant to 42 U.S.C. § 6972 and 28 U.S.C. § 1331.

2. Venue is proper in this Court pursuant to 42 U.S.C. § 6972(a), and 28 U.S.C. §§ 1391(b) and 1395(a).

3. The undersigned representative for each Party certifies that he/she is fully authorized by the Party or Parties whom he/she represents to enter into the terms and conditions of this Consent Decree and to legally bind the Party or Parties to it.

4. Located in the Sunnyside area of Eastern Washington, Defendant View Point Dairy is located at or near 1400 Lewandowski Road, Sunnyside, WA 98944, and includes Yakima County Parcel Numbers 231004-41002, 231009-21002, 231009-12001, 231009-11002, and 231009-11001. View Point Dairy meets the federal and state law definitions of a large concentrated animal feeding operation.

5. For this Consent Decree, the following terms will have the corresponding meaning:

       a. The term "Dairy" shall refer to (1) the operational and process facilities, including manure storage lagoons and compost areas, as shown in the map on the aerial photograph attached as Exhibit 1

CONSENT DECREE     ~ 3

hereto (hereafter the "Production Area" as defined in 40 CFR

122.23(b)(8)); and (2) the Application Fields.

b. The term "Application Fields" shall mean the manure application

fields owned, leased, or otherwise controlled by Defendant. The term

"Application Fields" does not include any field that is not set forth in

the Dairy Nutrient Management Plan ("DNMP"). As of the date of

this Consent Decree, the Application Fields consist of the fields

depicted in Exhibit 2.

c. The term "Dairy Operations" shall refer to the dairy-related

activities including raising, managing or milking dairy cowsand

support stock; collecting, composting, and otherwise managing dairy

manures; and applying dairy manure to application fields, collectively,

individually, or in any combination, conducted by Defendant within

the Production Area and Application Fields.

d. The term "Production Area" shall mean the dairy operational and

process facilities, including the dairy manure storage lagoons as

defined in 40 CFR 122.23(b)(8) and compost areas, and as shown in

the map on the aerial photograph attached as Exhibit 1.

6. This Consent Decree shall apply to and be binding upon the Parties to this

action, and upon the successors and assigns of the Parties who conduct Dairy

CONSENT DECREE    ~ 4

Operations or other CAFO Operations. This provision is intended to require full compliance with this Consent Decree so long as the Dairy is used by any affiliated person or entity in the course of conducting Dairy or other CAFO Operations at the Dairy; provided that nothing herein shall prevent Defendant from discontinuing their Dairy Operations, in whole or in part, at the Dairy, or from transferring any or all of the Dairy (including one or more of the Application Fields) to other entities for Dairy Operations or for uses other than for Dairy Operations. Should any such discontinuance of Dairy Operations occur on any or all of the Dairy, this Consent Decree shall no longer apply to any such portion of the Dairy that is not being used for Dairy or other CAFO Operations. Defendant, or any of its successors or assigns, may sell or otherwise transfer interest in the Dairy (including but not limited to one or more of the Application Fields, or any of the real property upon which the Dairy is situated or where Dairy Operations are conducted, in whole or in part), without Plaintiffs' consent and without approval of the Court; provided, however, that Defendant must provide a copy of this Consent Decree to the new owner or transferee and provide written notice to Plaintiffs of the sale or other transfer of real interest no later than 30 days after closing. The terms of this Consent Decree run with the property for any Dairy or other CAFO Operations until satisfied.

7. Any paragraph or subparagraph heading or section title in this Consent

CONSENT DECREE      ~ 5

Decree is provided solely as a matter of convenience to the reader and shall not be construed to alter the meaning of any provision of this Consent Decree.

### Section 2: Dairy Manure Storage Lagoons

8. Defendant shall complete by no later March 31, 2023, an Engineering Water Budget in order to document the sufficiency of on-site storage under Dairy operating conditions contemplated in this Consent Decree.

9. Defendant shall complete and submit to Plaintiffs by no later than March 1, 2023, the Final Dairy Lagoon Work Plan and Basis of Design Report. The lagoon lining design shall be, at a minimum, compliant with NRCS-approved designs for synthetically lined lagoons in effect as of the date of entry of this Consent Decree. Defendant will complete this plan under NRCS protocols; specifically, according to the July 2017 NRCS guidance titled Pond Sealing or Lining – Geomembrane or Geosynthetic Liner, attached hereto as Exhibit 3. Consistent with those standards, the design will use, at a minimum, a 60-mil HDPE liner, an under drain, a leak detection sump, a compacted soil under-liner with a permeability of 10-4 cm/sec or less and applicable gas venting. No additional liners or features are needed for a sufficient design, but Defendant may use a more robust design.

10. Defendant shall line Lagoons 1-3 as set forth in the Dairy Lagoon Work Plan and Basis of Design Report and Engineering Water Budget. The schedule for

CONSENT DECREE      ~ 6

lining Lagoons 1-3 is as follows:

      a. Lagoon 3 – by no later than December 31, 2024.

      b. Lagoon 2 – by no later than December 31, 2026. If Defendant receives a fifty percent (50%) match for the lining of Lagoon 3, Defendant shall line Lagoon 2 by no later than December 31, 2025.

      c. Lagoon 1 – by no later than December 31, 2028, with the understanding that Defendant will have received fifty percent (50%) matching funds to complete this lining. Notwithstanding the foregoing, if Defendant receives fifty percent (50%) matching funds for the lining of either Lagoons 2 or 3, then this match requirement for Lagoon 1 will not apply. If no matching funds are received to complete the lining of Lagoons 1, 2 or 3, then the lining of Lagoon 1 is not required. If Lagoon 1 is not lined, then it may not be used for manure storage after December 31, 2028.

      11. According to Defendant, Lagoon 4 was installed in compliance with NRCS standards using a geosynthetic clay liner (GCL) with a protective soil cover layer, and a downgradient leak detection well was installed in coordination with the South Yakima Conservation District. Defendant will monitor this well in addition to the wells described in Exhibit 4 to verify that the Lagoon 4 liner is performing as described. If the monitoring well data shows a confirmed nitrate

exceedance of the MCL (>10 ppm nitrate nitrogen), View Point will conduct an evaluation of Lagoon 4 to confirm whether it is leaking. That evaluation will include installation of two lysimeters beneath Lagoon 4 to test for potential leakage. The evaluation shall be completed within twelve (12) months of the confirmed MCL exceedance. If leakage is detected, the Parties shall first confer about whether repair is practicable. If the Parties disagree about the practicability of liner repair after conferral, then the matter shall be resolved through the dispute resolution provision set forth in Paragraph 57 of this Consent Decree. If the Court determines the repairs are not practicable, the liner will be replaced with a liner consistent with those to be used for lagoons 1, 2 and 3 and contained in Exhibit 4, or else the lagoon will be abandoned. Lining, repair, or abandonment of Lagoon 4 shall be completed within 12 months of completion of the Lagoon 4 evaluation or December 31, 2028, whichever is later.

12. Defendant may abandon any lagoon that it chooses not to line. As used in this Consent Decree, a lagoon is "abandoned" once manure has been removed, nutrient-rich soils have been removed and the lagoon has been filled or otherwise modified to prevent impounding of water or other liquids. If storage capacity is not needed, engineer-stamped documents shall be provided to Plaintiffs indicating that the facility has adequate storage capacity for Dairy Operations without the lagoon proposed for abandonment. Such abandonment shall include the removal or

CONSENT DECREE    ~ 8

treatment of the abandoned lagoon bottom and side-wall soils containing greater than 45 mg N/kg (measured as the sum of ammonia-N and nitrate-N), and Defendant shall provide sampling data to Plaintiffs prior to final abandonment that documents that the bottom and side-wall soils of any abandoned lagoons contain less than 45 mg N/kg. If the sidewalls or bottom exceed 45 mg N/kg, then the lagoon shall be excavated until the soils contain less than 45 mg N/kg. In the event that Defendant chooses to abandon a lagoon in a particular calendar year, such abandonment shall be treated as if Defendant met the annual lagoon-lining requirement for that particular calendar year (but, for instance, Defendant may not abandon one lagoon with a proposal to expand the capacity of a lagoon to be lined later to handle capacity needs caused by the abandonment of that particular lagoon).

13. Defendant may combine any lagoons to decrease overall storage or construction costs. In the event that Defendant chooses to combine two lagoons in a particular calendar year, such combination shall be treated as if Defendant lined one lagoon for that calendar year and one lagoon for the next calendar year.

14. Plaintiffs shall be permitted to observe and inspect Defendant's activities with respect to all lagoon lining projects pursuant to Section 10, paragraph 46 below.

15. Defendant shall provide Plaintiffs with an as-built report following the

CONSENT DECREE    ~ 9

lining or abandonment of each lagoon pursuant to this Section. Defendant shall provide the as-built report to Plaintiffs no later than February 28th in the calendar year following completion of such lining or abandonment of such lagoon. For lagoons that are lined pursuant to this Consent Decree, the as-built report shall include, at a minimum, the following information:

a. Survey of lagoon topography at the completion of soil work (excavation, fill, grading and compaction) prior to liner installation;

b. Results of compaction test data including lagoon floor, slope, and sump;

c. Final liner leak detection survey and results of any puddle surveys prior to filling of lagoon;

d. As-built drawings with vent locations, sump details, sump shape and volume, and utility locations;

e. Leak detection pump test data; and

f. Photo or video documentation of each lagoon at six project milestones: beginning of construction; completion of earthwork; placement of secondary liner; installation of sump and piping; placement of primary liner; and project completion.

### Section 3: Groundwater Well Installation and Monitoring

16. The Dairy shall install and routinely monitor three (3) new ground water

CONSENT DECREE    ~ 10

monitoring wells at locations to be selected by CARE, in the vicinity of the

locations set forth in Exhibit 4. CARE's representative will meet at the Dairy no

later than December 15, 2022, to determine the optimal well placement. The new

wells shall be installed in the first water table aquifer encountered. The existing

monitoring well (i.e., the well installed by Anchor QEA) shall also be monitored at

the same time for a total of four (4) monitoring locations. These four (4) wells shall

be sampled quarterly (no later than the last day of March, June, September and

December) for the first year and semi-annually (no later than the last day of June

and December) thereafter. Dedicated sampling pumps shall be installed in each

monitoring well. The required analyte list for the first year of quarterly sampling is

provided below.

> i. Nitrate (as nitrogen) by EPA Method 300.0

> ii. Nitrite (as nitrogen) by EPA Method 300.0

> iii. Ammonia by EPA Method 350.1

> iv. Total phosphorus by EPA Method 365.3

> v. Total Kjeldahl nitrogen (TKN) by EPA Method 351.2

> vi. Inorganic anions (chloride, fluoride, sulfate) by EPA Method
> 300.0

> vii. Metals (calcium, potassium, magnesium, sodium) by EPA
> Method 200.7

CONSENT DECREE    ~ 11

viii. Alkalinity (total and bicarbonate) by Standard Method

2320B.

17. After the first year, the wells shall be tested semi-annually (not later than the last day of June and December) for only nitrate so long as nitrite and ammonium have not been present for the four most recent tests. If nitrite or ammonium is present in any of the four most recent tests, then testing shall continue for the present parameter(s) until four (4) consecutive tests show no nitrite or ammonium present. Monitoring shall continue until the groundwater concentrations of nitrate are below its MCL (10 mg nitrate-N/L) and concentrations of nitrite are below its MCL (1.0 mg nitrite-N/L) for four (4) consecutive sampling events in all four (4) wells, at which point monitoring may cease.

18. Defendant shall install the new monitoring wells by no later than March 1, 2023, using continuous core drilling or roto-sonic techniques, depending on site conditions. Defendant shall complete the first four (4) quarterly sample events by no later than December 31, 2023.

### Section 4: Stormwater Engineering

19. Defendant shall complete and submit to Plaintiffs a Stormwater Piping and Engineering Plan that identifies the locations of underground pipes and other stormwater conveyances in the Production area and used by Dairy Operations by

CONSENT DECREE    ~ 12

no later than April 30, 2023. The Stormwater Piping and Engineering Plan shall identify any stormwater upgrades necessary to convey stormwater to the Dairy's manure lagoons. Defendant shall complete stormwater upgrades described in the Stormwater Piping and Engineering Plan by no later than December 31, 2023, exclusive of those drainage upgrades otherwise listed in Section 7 below.

## Section 5: Cow Pen Maintenance

20. Defendant shall complete the drainage improvements on the west side of the western dairy cow pen by no later than December 31, 2023. These drainage improvements are defined in Exhibit 5.

21. Defendant shall apply the maintenance standards identified in Exhibit 6 to the dairy cow pens currently in place at the Dairy or added to the Dairy Operations in the future.

## Section 6: Silage Areas

22. Defendant shall collect and route to the lagoon system all stormwater and silage liquids collected from the silage area. Defendant shall complete the necessary silage drainage improvements by no later than December 31, 2023. The required improvements are defined in Exhibit 7.

## Section 7: Compost Areas

23. Defendant shall implement drainage improvements in the existing compost area consistent with Exhibit 8. The improvements include construction of

CONSENT DECREE    ~ 13

new lined drainage ditches and piping to convey leachate and stormwater to the lagoon system.

24. Defendant shall complete construction to the drainage improvements identified in Exhibit 8 by no later than December 31, 2025, to ensure all runoff in the area is captured and directed to the lagoon system.

25. Lined ditches used as part of the work defined in Exhibit 8 will be lined with 40 mil HDPE geomembrane. Asphalt or concrete lining or piped conveyances may be used as alternates.

26. Defendant shall align compost windrows along a northeast-southwest alignment as shown in Exhibit 8. Defendant shall conduct regrading and re-compaction of the compost area as necessary to achieve a 2.0% minimum average[1] grade along the compost windrows toward the drainage ditches swales shown in Exhibit 8. By no later than December 31, 2024, Defendant shall submit to Plaintiffs a survey completed by a licensed surveyor documenting the grades achieved. Survey transects shall be  located nor more than 50 feet apart. Measurement of grade shall be performed at control points approximately every 50 feet along each transect. The grade of the compost area must average no less than

---

[1]   The average slope of the compost area, as used herein, shall be the mean value calculated using the transect measurements taken at approximately every 50-feet as discussed in paragraph 26 of this Consent Decree.

CONSENT DECREE        ~ 14

2.0% along each transect, and the grade at each individual transect control point must be no less than 1.0%. The grading tolerances of this paragraph recognize both the limitations of earthen grading with existing on-site soils and the need to provide positive drainage for leachate and stormwater during composting operations. The slope requirements and measurement protocol provided for in this Paragraph shall also apply to any future reconstruction, modification, repair, relocation or expansion of the Dairy's compost area(s) throughout the term of the Consent Decree.

27. By no later than June 30, 2023, Defendant shall perform soil proctor and compaction testing throughout the compost areas used for Dairy Operations. Compaction testing shall be performed on a grid (four (4) locations per acre). Areas not meeting 95% compaction of standard proctor shall be re-compacted and re-tested by no later than December 31, 2024. Where required, such recompaction shall be performed in conjunction with any re-grading work required under paragraph 26 and the drainage improvements required under paragraph 24.

28. View Point shall conduct routine maintenance at least quarterly to minimize minor depressions with negative grades capable of forming ponds or puddles greater than ten feet in diameter.

29. Paragraphs 23 through 28 comprise each and every obligation necessary to comply with Section 7 of this agreement and no other obligations are required.

CONSENT DECREE    ~ 15

## **Section 8: Manure Application and Field Management**

30. The provisions of this Section shall apply only to Application Fields owned, leased, or otherwise controlled by Defendant and used for application of dairy manure, including any Application Fields Defendant owns, leases, or otherwise controls after the Effective Date and during the term of this Decree. All such Application Fields owned, leased, or otherwise controlled by Defendant shall be addressed in Defendant's DNMP.

31. With respect to nitrogen, Defendant shall adhere to the following beginning in the Fall of 2022 for all Dairy manure applications:

a. Defendant shall make nitrogen applications at or below the agronomic rates based on Application Field-specific nutrient management budgets prepared by an agronomist.

b. Defendant shall restrict their manure application in the manner described in the following Table:

## **Table 1. Manure Application Restrictions for Nitrogen Control**

| Fall Average Residual N in Upper 2 feet | Nitrogen Application Restrictions Based on Measured Fall Average Residual Soil Nitrogen Levels $(NH_4\text{-}N+NO_3\text{-}N)$ |
|---|---|

CONSENT DECREE      ~ 16

| (NH$_4$-N+NO$_3$-N) | Crop Year 2023 (Fall 2022) | Crop Year 2024 (Fall 2023) | Crop Year 2025 (Fall 2024) | Crop Year 2026+ (Fall 2025) |
|---|---|---|---|---|
| ≤ 15 mg N/kg | 100% of agronomic rate | 100% of agronomic rate | 100% of agronomic rate | 100% of agronomic rate |
| 15.1-25 mg N/kg | 100% of agronomic rate | 100% of agronomic rate | 95% of crop extraction rate | 90% of crop extraction rate |
| 25.1-35 mg N/kg | 95% of crop extraction rate | 85% of crop extraction rate | 80% of crop extraction rate | 75% of crop extraction rate |
| 35.1-45 mg N/kg | 90% of crop extraction rate | 80% of crop extraction rate | 70% of crop extraction rate | 60% of crop extraction rate |
| > 45 mg N/kg | No application | No application | No application | No application |

c. For purposes of interpreting Table 1:

i. Nitrogen agronomic rate limitation shall apply to both the winter and summer crop, based on Fall post-harvest and Spring pre-plant sampling, unless follow-up soil nitrogen measurements fall into a lower category

CONSENT DECREE    ~ 17

and crop tissue (basal stem and leaf sampling) measurements show a deficiency in the crop tissue for nitrogen.

ii. If a given Application Field exceeds 25 mg N/kg for three (3) years in a row after crop year 2026, then Defendant shall reduce the application limit for that field from 75% to 50% until the nitrogen level drops below 15 mg N/kg.

iii. If a given Application Field exceeds 35 mg N/kg for two (2) years in a row after crop year 2026, then Defendant shall apply no manure to that field until the nitrogen level drops below 15 mg N/kg.

d. Nitrogen levels used to determine compliance with Table 1 shall be measured by the average of nitrate-nitrogen plus ammonium-nitrogen in each of the top two feet of the soil column based on Fall post-harvest sampling results.

32. Defendant shall endeavor to achieve a 40-ppm phosphorus long-term goal in the top foot of soil of the Application fields; however, the Parties agree that Defendant's phosphorus goal set forth in this paragraph is not enforceable, whether at law or in equity, and failure to achieve that goal, or to endeavor to do so, shall not be a basis for (i) sanctions, (ii) nontermination of this Consent Decree, or (iii) modification of this Consent Decree.

33. Defendant shall implement a soil moisture monitoring program at the

CONSENT DECREE    ~ 18

Dairy Application Fields in accordance with the following requirements:

    a. For purposes of this paragraph, a "Soil Moisture Monitoring Period" begins two weeks prior to Defendant's first irrigation or dairy manure application event in each Application Field through at least two weeks after Defendant's final irrigation or manure application event in each field. During most years, the Soil Moisture Monitoring Period will extend from mid-March through early November.

    b. During the Soil Moisture Monitoring Periods in 2023, 2024 and 2025, Defendant shall install and operate up to 4 irrigation sensor stations in the Dairies' application fields. For Application Fields that contain soils with significantly different nitrate leaching potential or water holding capacity, as indicated by the Natural Resources Conservation Service ("NRCS") Web Soil Survey, Defendant will include soil moisture sensors in each of two representative soil series. Defendants shall provide by December 31, 2022, maps showing the locations of the proposed soil moisture sensors and the areas of soil type and nitrate leaching potential.

    34. Defendant shall install sensors in each location at the following three approximate depths (variable by +/- two inches): 0.5-foot, 1.5-feet and 2.5-feet. If rocky or indurated soil properties in any location preclude effective placement of

the 2.5-foot sensor after three independent boring attempts, Defendant shall not be required to install the 2.5-foot sensor in that location(s), but shall document for each of those location(s) the total depth of soil to the point of boring refusal.

35. To verify field capacity estimates, Defendant shall calibrate sensors at the time of installation using a gravimetric sample approach where soil water is measured on a weight basis. Soil bulk density measurements used in calibration shall be confirmed for each sensor location at each depth. Calibration shall be reported to Plaintiffs.

36. Defendant shall calibrate any replacement sensors in a similar manner as in Paragraph 33, and these calibrations shall be reported to Plaintiffs.

37. Defendant shall inspect sensors monthly to maintain the sensors in an operational condition throughout the Soil Moisture Monitoring Period. Defendant shall implement necessary maintenance, repairs or replacement of the sensors with the goal of avoiding operational down-times. Operational down-times are expected to remain less than 30 days within an irrigation season, with the exception of force majeure events.

38. Defendant shall use the soil moisture sensors to validate and, if necessary, adjust its irrigation rates to meet crop needs while minimizing exceedances of Application Field capacity in the 2.5-feet soil level.

39. Beginning on the Effective Date, Defendant shall for the duration of this

Decree maintain application records of (a) any dairy manure it hauls to and applies to an Application Field; and (b) any dairy manure it applies to Application Fields through irrigation or blending. Such records shall include the Application Field ID; the manure quantity (volume); characteristics (blended or straight); date of application; and a link to the manure nutrient testing information. Defendant shall keep separate application records in the event that an application takes place over multiple days, or if multiple applications are conducted to the same field on different days.

40. No later than January 31 of each year beginning in 2023 and for each year for the duration of the Consent Decree, Defendant shall provide to Plaintiffs PDF copies of dairy manure management records for the prior crop year via electronic mail (at the addresses listed in Paragraph 62). Records that Defendant shall provide pursuant to this paragraph are listed in Exhibit 9.

41. Any dairy manure management records routinely generated by Defendant in compliance with their CAFO permit and similar regulatory requirements shall be kept on-site at the Dairy for five (5) years from the date of generation. No more than twice per calendar year, Plaintiffs shall have the right to request access to conduct an on-site review of the manure management records for which they have not been provided copies pursuant to Paragraph 39.

42. Defendant shall use flow meters on all Dairy Application Fields to which

CONSENT DECREE       ~ 21

it applies lagoon water through irrigation or blending.

**Section 9: Clean Drinking Water Project Funding**

43. The Dairy is not under any obligation to contribute any money to the Clean Drinking Water Project unless samples from at least one of the on-site monitoring wells tests above 10 ppm N as nitrate or 1.0 ppm N as nitrite for more than two consecutive monitoring events. If one or more of the on-site monitoring wells test above 10 ppm N as nitrate or 1.0 ppm N as nitrite for more than two consecutive events, then the Dairy shall pay to the Clean Drinking Water Project $1,000 per month until all four on-site monitoring wells drop below 10 ppm N as nitrate and 1.0 N as nitrite for four consecutive monitoring events, at which time the Dairy's obligation to pay $1,000.00 per month will terminate. When applicable, Clean Drinking Water Project payments may be made in a single annual payment due prior to December 31st of the applicable calendar year. The "monitoring wells" to which this Section refers to are the four wells described in Paragraph 16.

44. The Clean Drinking Water Project, already in place, shall be expanded to provide alternative clean drinking water to residents in the area. All aspects of the program shall be managed by the Clean Drinking Water Project; View Point's only obligation is to provide the agreed upon funding set forth in Paragraph 43 above.

**Section 10: Site Inspections**

45. Pursuant to the above Sections 2 through 9 (Manure Storage Lagoons,

CONSENT DECREE    ~ 22

Groundwater Well Installation and Monitoring, Stormwater, Piping, and

Engineering Plan, Silage Area, Compost Area, Manure Application and

Management), and relating to Plaintiffs' observation and/or inspection of activities

at the Dairy, the following provisions shall apply:

       a. For each activity Plaintiffs are permitted to observe and/or inspect,

Plaintiffs may have up to three representatives present at the Dairy

during such observation or inspection.

       b. Plaintiffs' representatives are permitted upon the Dairy solely to

observe and inspect the activities provided.

       c. Plaintiffs' representatives shall have applicable scientific or

professional qualifications to be able to confirm compliance with this

Consent Decree.

       d. At least twenty-one (21) days prior to any such observation and

inspection, Plaintiffs shall provide Defendant written notice of their

intent to observe and inspect the Dairy, identifying the Section of this

Decree related to the inspection, what physical area of the Dairy they

intend to inspect, any alleged or anticipated problems subject to

inspection, and who shall attend. Such notice shall include the names

of the proposed observers/inspectors, a description of their

qualifications (if not otherwise known to Defendant), and the start and

CONSENT DECREE    ~ 23

1    end times of the proposed period of observation/inspection (which

2    shall not be before 8:00 AM or after 5:00 PM).

3    e. The representatives may not remain on the Dairy outside of

4    business hours unless otherwise agreed and must be accompanied by a

5    representative of Defendant at all times.

6                   **Section 11: Fees and Costs**

7       46. Plaintiffs claim the right to recover reasonable attorneys and expert

8 witness fees under RCRA.

9       47. After determining the hours expended in preparation and prosecution of

10 this litigation and the anticipated costs of the oversight of implementation of this

11 Consent Decree, Defendant and Plaintiffs agree that the sum of $46,000.00, will be

12 paid to the Law Offices of Charles M. Tebbutt, P.C., 941 Lawrence St., Eugene

13 OR 97401, Attention: Charles M. Tebbutt, within thirty (30) days of entry of this

14 Consent Decree in full and complete satisfaction of an award of such costs and fees

15 incurred through the date of entry of the Consent Decree.

16       48. Defendant shall reimburse Plaintiffs for costs documented by Plaintiffs

17 that are necessary to monitor implementation of this Decree ("Monitoring Costs")

18 up to the following maximum amounts, subject to the terms in Paragraphs 49-51

19 below:

20     2023: $10,000

CONSENT DECREE    ~ 24

2024: $15,000

For each year thereafter until Consent Decree termination: $5,000. The parties intend the foregoing maximum thresholds to include Plaintiffs' costs, expert fees, and attorneys' fees.

49. The Parties shall use best efforts to minimize Plaintiffs' Monitoring Costs. For instance, the Parties shall maintain open communication with each other in order to minimize the Monitoring Costs; Defendant shall provide required documentation in electronic format in a timely manner to Plaintiffs; and Plaintiffs shall attempt to bundle activities and associated site visits where possible. Yearly monitoring fees are intended to cover costs of oversight of Consent Decree implementation and assume compliance. Should compliance not be achieved, Plaintiffs reserve the right to seek additional fees and costs which may be awarded by this Court only under applicable law and procedure.

50. No later than February 15 of each year from 2024 through and including 2030, Plaintiffs shall submit a single package of invoices to Defendant that document Plaintiffs' Monitoring Costs for the prior year. The invoices shall provide a brief narrative describing the work Plaintiffs performed and an itemization of associated Monitoring Costs. Defendant shall have thirty (30) calendar days to review invoices and identify any disputed Monitoring Costs for discussion with Plaintiffs. Undisputed Monitoring Costs shall be paid within 60

calendar days of Defendant's receipt of the invoice(s) reflecting the undisputed Monitoring Costs. Disputed Monitoring Costs shall be subject to the Dispute Resolution provisions of Paragraph 56.

## Section 12: Other Terms and Conditions

51. This Consent Decree is intended to be and shall constitute the exclusive remedy and final resolution between Plaintiffs, including their officers and directors, and Defendant for all alleged violations of RCRA and all issues as set forth in the Complaint and/or 90-Day Notice filed in this case that may have occurred or that could have been raised prior to the entry of this Consent Decree.

52. Each Party acknowledges and represents that they have relied on the legal advice of their attorney, who is the attorney of their own choice and that the terms of this Consent Decree have been completely read and explained to them by their attorney, and that the terms are fully understood and voluntarily accepted. Plaintiffs have been represented by Charles M. Tebbutt of the Law Offices of Charles M. Tebbutt, P.C. Defendant has been represented by Kent D. Krabill, of counsel to Lynn Pinker Hurst Schwegmann LLP.

53. If for any reason the Court should decline to approve this Consent Decree in the form presented, the Parties agree to continue negotiations in good faith in an attempt to cure any objection raised by the Court to entry of this Consent Decree.

CONSENT DECREE    ~ 26

54. Defendant need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## Section 13: Integration

55. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding of the Parties with respect to the settlement embodied in this Consent Decree and the subject matter of this action. The Parties acknowledge that there are no representations or understandings relating to this action and settlement other than those expressly contained in this Consent Decree.

## Section 14: Modification

56. This Consent Decree may not be modified by the Parties except by written amendment signed by the Parties and shall be effective upon approval by the Court. If the Parties agree in writing that the modification is minor, the Parties may agree to the written modification without approval by the Court. However, no such minor modification will be binding, unless the parties each expressly and affirmatively agrees to the following language:

**"WE AGREE THAT THIS WRITING MODIFIES THE COURT'S CONSENT DECREE AND AGREE TO THIS MODIFICATION IN SUBSTANCE AND FORM"**

CONSENT DECREE      ~ 27

Such minor modification must then be filed in the Court's docket before it becomes operative. The Court reserves the right and power to reject or modify any such minor modification.

Any modification that lacks either the foregoing statement or Court approval shall not be binding in any way on any party.

### Section 15: Retention of Jurisdiction and Dispute Resolution

57. The Court shall retain jurisdiction over this matter for the purpose of interpreting and enforcing the terms of the Consent Decree. In the event of any dispute regarding implementation of or compliance with the Consent Decree, the Parties shall first attempt to informally resolve the dispute through meetings between the Parties. Any Party may initiate informal dispute resolution by serving Notice of a request for dispute resolution pursuant to this Paragraph. If no resolution is reached within thirty (30) days from the date that the notice of dispute is served, the Parties may resolve the dispute by filing motions with the Court.

### Section 16: Termination

58. The Consent Decree shall terminate when:

(i) the construction work in Sections 2, 4, 6, and 7 and the drainage improvements in Exhibit 5, Exhibit 7 and Exhibit 8 are complete;

(ii) the wells described in Section 3 are installed; and

(iii) the field management criteria in Section 8 have been fully satisfied and

CONSENT DECREE    ~ 28

incorporated into the Dairy's DNMP.

Irrespective of such termination, the monitoring obligations of Section 3 shall continue until terminated as described in Section 3. Sections 9 and 11 shall terminate by their own terms.

59. Notwithstanding anything herein to the contrary, each Section of this Consent Decree and each obligation imposed thereby shall terminate as described in Paragraph 58 of this Consent Decree, and once all criteria described in Paragraph 58 have been satisfied the parties agree to file a Notice of Termination and a proposed order within 14 days of satisfaction of all criteria terminating the Consent Decree and this litigation.

## Section 17: Released Claims

60. This Consent Decree is intended to be and shall constitute the exclusive remedy and final resolution between Plaintiffs and their officers and directors, and Defendant for all alleged violations of federal law and all issues as set forth in the Complaint and/or 90-Day Notice filed in this case that may have occurred or that could have been raised prior to the entry of this Decree, whether known or unknown, asserted or unasserted, accrued or unaccrued.

61. This Decree constitutes a full, final, and complete settlement of all claims, rights, demands, and causes of action for alleged violations of federal law

CONSENT DECREE      ~ 29

that Plaintiffs asserted, or could have asserted in the Complaint and the 90-Day

Notice filed in this case, whether known or unknown.

62. Neither Plaintiffs, including any person(s) or entity acting with, by or

through Plaintiffs, in either their own or in any representative capacity, nor any of

Plaintiffs' shareholders, officers or directors, shall file or cause to be filed or

intervene in any enforcement lawsuit in any court with respect to matters arising

from the allegations set forth in the 90-Day Notice and Complaint in this matter.

### Section 18: Notice

63. Whenever notice is required to be given or a document is required to be

sent by one Party to another under the terms of this Consent Decree, it will be

directed to the individuals at the addresses specified below, unless prior notice of a

change has been given to the other Party. Notice shall be deemed sufficient under

this Consent Decree if it is provided in writing through the U.S. mail/Federal

Express/UPS, hand delivered, or provided electronically by e-mail. In the event

that notice is provided by U.S. mail/ Federal Express/UPS, it shall be considered

effective upon receipt. This paragraph shall also apply to any payments made

under this Consent Decree, unless otherwise provided under this Consent Decree.

//

//

//

CONSENT DECREE      ~ 30

1     <u>As to Plaintiffs:</u>

2     Charles M. Tebbutt, Esq.
    B. Parker Jones, Esq.

3     Law Offices of Charles M. Tebbutt, P.C.
    941 Lawrence Street

4     Eugene, OR 97401
    charlie@tebbuttlaw.com

5     parker@tebbuttlaw.com

6

7     <u>As to Defendant:</u>

8     Kent D. Krabill, pro hac vice pending
    Texas Bar No. 24060115

    Joshua D. Lang, pro hac vice pending

9     Texas Bar No. 24060115

    Lynn Pinker Hurst & Schwegmann LLP

10     2100 Ross Avenue, Suite 2700
    Dallas, Texas 75201

11     Tel: 214-292-3600
    Fax: (214) 981-3839

12

13     **<u>Section 19: Effective Date and Final Judgment</u>**

14 64. This Consent Decree shall constitute a final non-appealable judgment in this

15 action and shall take effect on the day it is entered by the Court. The Court shall

16 retain jurisdiction to enforce the terms of this Consent Decree and to resolve any

17 disputes arising hereunder until the Consent Decree has been terminated in

18 accordance with Section 16 of this Consent Decree.

19 //

20 //

CONSENT DECREE      ~ 31

**IT IS SO ORDERED THIS 3rd DAY OF NOVEMBER 2022**.  All

Exhibits appearing at ECF No. 6-1 **are hereby incorporated** by reference into this

Consent Decree.

The Clerk of Court shall enter Judgment accordingly, provide copies to the

parties, and administratively close the file.

Dated November 3, 2022.

THOMAS O. RICE
United States District Judge

WE HEREBY CONSENT to the Entry of this Consent Decree:

**Community Association for Restoration of the Environment, Inc.**

By:        Signature on file at ECF No. 6-1.

**Friends of Toppenish Creek**

By:        Signature on file at ECF No. 6-1.

**Center for Food Safety**

By:        Signature on file at ECF No. 6-1.

*Plaintiffs*

**VIEW POINT DAIRY**

By:        Signature on file at ECF No. 6-1.

*Defendant*

CONSENT DECREE        ~ 32